**STATE OF NEW YORK and Thomas C. Jorling as Trustee of the Natural Resources, Plaintiffs,**

v.

**ALLIED–SIGNAL INC., Defendant.**

**No. 89–CV–815.**

United States District Court, N.D. New York.

Dec. 19, 1997.

---

138

Office of the Attorney General, Environmental Protection Agency, New York City, for plaintiffs; Norman Spiegel, of counsel.

Bond, Schoeneck Law Firm, Syracuse, NY, for defendant; Thomas R. Smith, of counsel.

Coughlin & Gerhart, Binghamton, NY, for defendant; Richard B. Long, of counsel.

Hunton & Williams, Richmond, VA, for defendant; Joseph M. Spivey, G.H. Gromel, Jr., Manning Gasch, Jr., of Counsel.

## MEMORANDUM–DECISION & ORDER

McAVOY, Chief Judge.

### I. BACKGROUND

On March 16, 1992, plaintiff the State of New York and defendant Allied–Signal Inc. ("Allied") entered into a Consent decree. In the Consent Decree, Allied, without admission of liability, agreed to finance the development and implementation of a Remedial Investigation and Feasibility Study ("RI/FS") addressing contamination of the Onondaga Lake System. (the "Site"). Allied

also agreed, pursuant to the Consent Decree, to prepare and submit to the State, for its approval, various interim written reports concerning contamination of the Site, including a Mercury Modeling Report (the "Mercury Report").[1]

Allied timely submitted the first version of the Mercury Report to the State in October 1994. According to the State, Allied agreed to obtain independent experts to aid the State in its review of Allied's Mercury Report and to assist Allied in its development of the Mercury Report. These independent experts completed their work and submitted their conclusions concerning the Mercury Report between March and May of 1995. In May 1995, Allied received initial comments regarding the Mercury Report. In June 1995, the State Department of Environmental Conservation ("DEC") met with two retained consultants to further review the Mercury Report. In August 1995, the State informed Allied that there were 51 "fundamental" problems in the Mercury Report's "transport and kinetics submodel." From August 1995 to May 1996, Allied responded to the State's comments regarding the transport and kinetics submodel.

In May 1996, the State requested that Allied correct other problems in the Mercury Report relating to the fish bioenergetics submodel. Specifically, the State asked Allied to perform a sensitivity analysis to ensure that the data Allied used did not undermine the submodel's results. According to the State, it had alerted Allied to the potential risks of using such data back in August of 1993. The State also contends that Allied had proposed to perform a sensitivity analysis at the beginning of the modeling process in September of 1992. Further, according to the State, its comments regarding the fish bioenergetics submodel were provided to Allied in May 1996 because it "deemed it prudent for Allied to address revisions to the [transport and kinetics submodel] before turning its attention to [the fish bioenergetics] submodel."

Allied also submitted to the State, in May 1996, a written schedule stating that it intended to submit the revised Mercury Report in April 1997. In a telephone conversation between the State and Allied, the State orally agreed to Allied's proposed schedule. The State requested, however, that a meeting be held in January 1997, during which the parties would discuss Allied's progress on the Mercury Report and decide on an exact date in April when the Mercury Report would be due. In August 1996, Allied confirmed by letter to the State that it would be submitting the revised Mercury Report in April 1997.

In January 1997, the State wrote a letter to Allied, iterating the importance of a January meeting to ensure that the Mercury Report would be approved when submitted by Allied in April 1997. The January meeting, however, never took place. According to the State, just days before the meeting was to occur, Allied informed the State that it would not participate in the face-to-face meeting because it desired to minimize costs. Instead, Allied proposed that a conference call be held. The State informed Allied that a conference call was not acceptable because of the logistical limitations of twenty people attempting to discuss complex and technical issues over the telephone. As a result of the disagreement between the sides, neither a meeting nor a conference call resulted.

On January 31, 1997, the State wrote to Allied, proposing April 15, 1997 as the exact submission deadline for the Mercury Report. The letter also invited Allied to respond with any comments. Almost two months later, Allied telephoned the State, questioning whether April 15, 1997 was a "hard date" for submission of the Mercury Report. The State informed Allied that the submission date was April 15, 1997. The State confirmed that date in a letter to Allied on March 25, 1997. On March 28, 1997, Allied wrote to the State requesting an extension of time to submit the Mercury Report. The State responded by letter dated April 4, 1997, directing that Allied provide the State with its reasons why an extension was necessary. On April 9, 1997, Allied wrote back that it had encountered delays regarding both the sensitivity analysis for the fish

---

1. The purpose of the Mercury Report is to analyze, through the use of a model, how mercury behaves at the Site and the manner and degree in which it accumulates in fish.

bioenergetics submodel and in obtaining data to be used in the transport and kinetics submodel. On April 15, 1997—the due date of the revised Mercury Report—Allied informed the State that it could not submit the Report because of a "computer bug." According to the State, it rejected Allied's requests for an extension of time because these delays concerned problems that were foreseeable and avoidable.

Allied did not submit the revised Mercury Report until June 12, 1997. Pursuant to the Consent Decree, the State contends that it is entitled to stipulated penalties because of the untimely filing of the revised Mercury Report.

Now before the Court is Allied's petition to set aside a determination by the State directing Allied to pay stipulated penalties for the alleged untimely submittal of the revised Mercury Report. The State, in turn, has cross-moved for an order directing Allied to pay stipulated penalties in the amount of $191,000.

## II. DISCUSSION

### A. Allied's Petition Is Not Time–Barred

As an initial matter, the State argues that Allied's petition is time-barred.

Two paragraphs of the Consent Decree govern dispute resolution. First, paragraph 41 provides that: "[i]n the event that the parties cannot resolve their dispute by negotiations, after reasonable efforts, the State may make a determination with respect to the subject of the dispute which determination shall be in writing and shall reference this provision of the Consent Decree." Second, paragraph 42 states that: "all determinations by the State . . . shall be final and binding upon Allied unless within thirty days of receipt of the State's determination by the attorney of record for Allied, Allied petitions this Court for review."

In the present case, Allied's petition challenges two basic determinations of the State: (1) the setting of the April 15, 1997 submission deadline for the Mercury Report; and (2) the State's finding that Allied did not comply with that deadline. Turning first to Allied's challenge to the April 15, 1997 dead-line for the Mercury Report, the State argues that this challenge is time-barred because the thirty-day limitations period for a petition by Allied to review this decision began running on March 25, 1997—the date when the State sent a letter to Allied (with copies to Allied's counsel) stating that the submission deadline for the Mercury Report was April 15, 1997—and expired at the end of April. Because Allied did not file its petition until September 29, 1997, the State argues that Allied's petition is time-barred.

■ The problem with this argument is plain; namely, that the State's March 25, 1997 letter does not reference paragraph 41 of the Consent Decree to qualify as a "determination" by the State regarding a dispute. Accordingly, because there has not been a "determination" by the State in accordance with paragraph 41 regarding the April 15, 1997 deadline, the State's letter of March 25, 1997 did not trigger the thirty-day limitations in paragraph 42. Further, because the State has failed to identify to the Court any other writings in which the State has made a "determination" in accordance with the requirements of paragraph 41 relating to the disputed April 15, 1997 deadline, the Court must assume that Allied's petition seeking review of this issue is not otherwise time-barred.

As to the State's decision that Allied did not comply with the April 15, 1997 deadline, the State again argues that Allied's petition is time-barred because the State gave Allied written notice of the alleged noncompliance on May 5, 1997. Again, however, the State's letter suffers from the same deficiency; namely, it contains no reference to paragraph 41.

The State argues, however, that paragraph 41 does not govern the State's decisions regarding a purported failure by Allied to meet report deadlines and the imposition of penalties. According to the State, paragraph 45 controls in such instances. That paragraph provides as follows:

Following New York's determination that Allied has failed to [submit to the State a timely submittal], New York shall give Allied written notification of the same and describe noncompliance. The notice shall

also indicate the amount of penalties already due and the amount of penalties to be due.

Although the State's letter of May 5, 1997 provides Allied with the notice contemplated by paragraph 45, the Court cannot agree that paragraph 45 renders inapplicable paragraph 41. First, paragraph 45 does not state that paragraph 41 does not apply in such instances. Nor does paragraph 41 state that it does not apply to paragraph 45 situations. Second, the State has provided no reason why paragraph 41 should not apply under these circumstances. As such, the Court will not ignore the unambiguous requirements concerning dispute resolution contained in paragraph 41.

Because a determination by the State in accordance with paragraph 41 of the Consent Decree has not been made, Allied's petition is not time-barred.

The Court now turns to address the merits of Allied's petition.

### B. Allied's Petition

Allied sets forth several arguments to support its position that the State's demand for stipulated penalties should not be enforced. First, Allied asserts that the State, in setting the April 15, 1997 deadline for submission of the Mercury Report, violated paragraph 31 of the Consent decree by (a) failing to seek agreement with Allied regarding a due date for the revised Mercury Report; and (b) setting a deadline of April 15, 1997 that was unreasonable under the circumstances. Second, Allied argues that the State should have granted Allied an extension of the purported deadline for the Mercury Report in light of certain problems it had with preparing that Report. Third, Allied argues that these same problems that justified an extension of the deadline also triggered the force majeure clause contained in the Consent Decree to excuse its noncompliance with the deadline.

None of these contentions has merit.

### 1) The April 15, 1997 Deadline for the Mercury Report

Paragraph 31 of the Consent decree states that a "submittal shall be revised by Allied within such time period as agreed to, in writing, by the parties or in the absence of agreement, as specified by the State, which time shall be reasonable under the circumstances ."

In this case, it is plain that the State did not violate paragraph 31 by establishing a due date of April 15, 1997 for the Mercury Report. While Allied strains to characterize the setting of the April 15, 1997 submission deadline as a "unilateral decision" by the State, it is Allied who initially offered, in May 1996, to submit the Mercury Report in April 1997. Furthermore, Allied confirmed that submission date in a letter to the State in August 1996. The State agreed to this date orally and planned a meeting in January 1997 to discuss, among other things, the exact date in April when the Mercury Report would be due. Allied decided, however, not to attend the meeting.

On January 31, 1997, the State sent a letter to Allied setting a specific due date of April 15, 1997. That letter, moreover, invited Allied to discuss the matter with the State. It is arguable that these letters between the sides constituted the parties' written agreement to set a deadline for the Mercury Report of April 15, 1997. Even if the Court views the setting of the April 15, 1997 deadline as a "unilateral" decision of the State, however, paragraph 31 expressly authorizes the State to establish deadlines in the absence of an agreement by the parties. Thus, the Court rejects Allied's argument that the establishment of the April 15, 1997 deadline somehow violated paragraph 31 of the Consent Decree because Allied did not agree to that due date.

Allied next asserts that the April 15, 1997 deadline violates paragraph 31 because it was not "reasonable" under the circumstances.

 The Court, however, cannot agree that the April 15, 1997 deadline was unreasonable when, as explained above, it is Allied that first proposed this deadline to the State in May 1996 and again in August 1996. Presumably, Allied would not have proposed this date if it was not a reasonable estimate of the time necessary to complete the Mercury Report. Further, in light of Allied's failure to

meet with the State and to keep the State apprised of its progress, the setting by the State of an exact date in mid-April for submission of the Mercury Report hardly was unreasonable. Finally, Allied never objected to the April 15 deadline at the time the State informed Allied of the exact due date. This is most telling, for if this deadline was, as Allied asserts, plainly infeasible, then Allied would have objected at that time.

Accordingly, the Court rejects Allied's argument that the setting of an April 15, 1997 due date for the Mercury Report was unreasonable under the circumstances.

### 2) Allied's Request for an Extension

Allied next asserts that the State acted arbitrarily and capriciously by denying Allied a time extension to submit the Mercury Report. Specifically, Allied argues that it encountered highly-technical problems concerning the Mercury Report, including problems relating to the sensitivity analysis, which made compliance with the April 15, 1997 deadline impossible. Additionally, Allied contends that a "computer bug" in the Mercury Model warranted the granting of an extension.

The State, by contrast, maintains that it did not act arbitrarily and capriciously in denying Allied's request for an extension. According to the State, Allied's cited problems were foreseeable and could have been avoided with proper planning. For instance, with respect to Allied's problems with the sensitivity analysis, Allied was aware that a sensitivity analysis was appropriate from the outset in 1992. Further, according to the State's expert, a sensitivity analysis could have been completed in two months. Similarly, with respect to other problems concerning the Model, the State's expert concluded that Allied had adequate time to gather the appropriate date and apply it to the Mercury Report. With respect to the "computer bug" problem reported by Allied on the day that the Mercury Report was due, the State responds that any such computer problem could have been foreseeable by Allied and avoided by appropriate testing of the Model in advance of the deadline. In any case, the State points out that Allied has

provided no documentation to the State supporting its contentions that these problems actually occurred.

Paragraph 42 of the Consent Decree provides that "Allied shall bear the burden of proof with respect to all issues in dispute." In addition, that paragraph provides that "the State's determination shall not be set aside except upon a finding that such determination is arbitrary, capricious or contrary to law."

■ In light of the deference the Court must accord the State's decisions, the Court finds that the State did not act arbitrarily, capriciously, or contrary to law in denying Allied's request for an extension. As explained by the State, it denied Allied's requests for an extension because it deemed the reasons proffered by Allied for the request to be insufficient; that is, these problems were foreseeable by Allied and could have been avoided with due diligence. Although Allied attempts to characterize the State's action in denying the request as arbitrary and capricious, the State's explanation for denying Allied's request provides ample evidence to the contrary.

### 3) Force Majeure Clause

Lastly, Allied asserts that the same problems that justified its request for an extension also triggered the force majeure provisions contained in the Consent Decree.

Like many environmental consent decrees, the Consent Decree between the State and Allied contained a force majeure provision. Paragraph 49 of the Consent Decree provides that "Allied's activities under this Consent Decree shall be performed within the time limits set forth herein unless performance is delayed ... by events which constitute a force majeure." Force majeure, for purposes of the Consent Decree, is defined as "(a) an act of God, war, riot, accident, labor dispute ... or (b) ... any circumstances of like or different character *beyond the control of* Allied or its agents, employees, consultants and contractors, and *which cannot be overcome by due diligence*" (emphasis supplied). Additionally, "Allied bears the burden of proving that any delay results

from circumstances which constitute a force majeure, that the delay could not have been overcome by due diligence, and that the proposed length of the delay is reasonably attributed to the force majeure."

Paragraph 50 also requires that. Allied orally notify the State as soon as possible of the occurrence of a force majeure. Written notification also must result within ten days of the occurrence. Further, paragraph 50 states that Allied's written notice of the force majeure include: "1) a description of the circumstances constituting the force majeure; 2) the actions (including pertinent dates) that Allied has taken and/or plans to take to minimize any delay; and 3) the date by which ... Allied proposes to complete the delayed activities." If Allied fails comply with paragraph 50's notice requirements, that paragraph states that Allied is not entitled to an extension of time.

■ The Court finds that Allied has not complied with the notice requirements of paragraph 50. Allied failed to give timely oral notice of the circumstances relating to its alleged problems; it also failed to provide adequate documentation to the State relating to these problems. Even assuming that Allied satisfied the notice requirements of paragraph 50, the excuses provided by Allied plainly do not qualify as a force majeure under the Consent Decree. Not only were the problems cited by Allied within its control, but Allied also has failed to carry its burden to show that these problems could not have been overcome without due diligence. *See, e.g., Phillips Puerto Rico Core, Inc. v. Tradax Petroleum Ltd.,* 1984 WL 677, at *4 (S.D.N.Y. August 2, 1984) (stating that a force majeure event "must be beyond the control and without the fault or negligence of the party relying on" the force majeure provision) (citations omitted).

The Court thus concludes that the force majeure provision does not apply to excuse Allied's noncompliance with the deadline.

### C. The State's Cross–Motion for Stipulated Penalties

The State has cross-moved for stipulated penalties in the amount of $191,000 for Al-

lied's untimely submission of the Mercury Report.

The Consent Decree provides that Allied must pay stipulated penalties for any failure to adhere to report deadlines, including the Mercury Report. In this case, for the reasons discussed above, the Court found that Allied did not timely submit the Mercury Report. Pursuant to the unambiguous terms of the Consent Decree, Allied is required to pay the State stipulated penalties in the amount of $191,000.

### III. CONCLUSION

For the reasons stated above, Allied's petition to set aside the State's demand for stipulated penalties is DENIED. The State's cross-motion for stipulated penalties in the amount of $191,000 is GRANTED.

**IT IS SO ORDERED.**